UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ODAIR FERNANDES, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Criminal No. 19-cv-11026-ADB |
| | * | |
| STEVEN SILVA, | * | |
| | * | |
| Respondent. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Petitioner Odair Fernandes ("Fernandes") is serving a life sentence following convictions in Suffolk County Superior Court for murder, assault with intent to murder, and two related firearms charges. Currently before this Court is his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [ECF No. 1].

For the reasons set forth below, the petition, [ECF No. 1], is **DENIED**.

**I.      FACTUAL BACKGROUND**

The Massachusetts Supreme Judicial Court's ("SJC") recitation of the facts is reproduced in relevant part below (including the footnotes from the opinion).[1]

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). This presumption applies with equal force to findings of fact by state trial and appellate courts. RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002). The facts can be rebutted only with "clear and convincing evidence to the contrary." Id.; see 28 U.S.C. § 2254(e)(1).

1

A. **The Crime**

The SJC made the following findings of fact regarding the crimes underlying Fernandes's conviction:

> On April 17, 2003, the defendant was driving his Volkswagen automobile with passengers Danny Fernandes and Jose Alves when he cut off a vehicle driven by Joao Nunes on Bowdoin Street in the Dorchester section of Boston. Nunes's passenger, Alfredo Goncalves, got out of the automobile and threatened the defendant, repeatedly stating that he was going to hurt him. The defendant drove away.
>
> After acquiring a handgun, Nunes and Goncalves drove back later that day to the Bowdoin Street neighborhood looking for people with whom they had "dramas." This included the Cape Verdean Outlaws gang, of which the defendant and his friends were members. As Nunes drove past the defendant's house, Goncalves pointed out Amilton Dosouto, an individual with whom he had issues. Dosouto was standing in the defendant's driveway next to the defendant's Volkswagen Golf automobile, while Alves sat on the porch. As Nunes drove by, Goncalves fired from the passenger side of the automobile, hitting Dosouto in the chest and Alves in the stomach and the leg. The defendant ran into the street, firing at Goncalves. His shots hit Nunes, who then crashed his vehicle.
>
> When police arrived at the scene, the defendant was near Dosouto. Boston police officer testified that he heard the defendant state repeatedly, "Somebody is going to die for this," and that when asked for information about the shooting, the defendant told him, "I got nothing to say to you. Somebody's going to die for this." Alves testified that while he was recovering in the hospital, he spoke to the defendant on the telephone and the defendant said, "Don't worry about it," because the people responsible were "going to get it." Dosouto considered the defendant to be like a younger brother.
>
> On April 24, 2003, the defendant rented a white minivan. There was no indication on the record that his Volkswagen Golf automobile was inoperable.
>
> On April 28, 2003, three of Goncalves's friends, Jonathan DaSilva, Jose DaVeiga, and Christopher Carvalho, left a night club in Boston after 2 A.M. DaSilva was driving his Ford Taurus automobile and stopped at a red traffic light on East Berkley Street when shots were fired at his automobile. His passengers, DaVeiga and Carvalho, were both hit multiple times. DaVeiga died as a result. Carvalho survived but was paralyzed from the neck down and blinded in his left eye.
>
> An eyewitness to the shooting testified that two or three people fired shots at the Ford automobile from the passenger side door of a white van. The eyewitness

testified that all of the van's occupants wore sports jerseys, and that one wore New England Patriots colors while another wore a green and white jersey.

Shortly after the eyewitness notified the police of the shooting, officers stopped a white minivan in Dorchester. The defendant, wearing a Boston Celtics jersey, was in the front passenger seat. Danny Fernandes, wearing a Dallas Cowboys jersey, was in the driver's seat. Carlos Silva, wearing a red, white, and blue Atlanta Braves jacket, was in the rear passenger seat. The eyewitness was brought to the scene, where he identified Danny Fernandes and Silva as the driver and shooter but did not identify the defendant.

A police search of the minivan recovered two .25 caliber shell casings and a nine millimeter firearm hidden underneath a cup holder in the back of the van. The firearm was wrapped in a piece of paper torn from a Volkswagen Golf automobile manual. A Volkswagen Golf automobile manual was also found in the van, along with a crowbar. The firearm did not match the bullets recovered from the victims' bodies, but did match other spent shell casings recovered at the scene of the shooting. The police also found a white minivan rental agreement in the defendant's name, dated April 24, 2003.

Commonwealth v. Fernandes, 89 N.E.3d 1130, 1134–35 (Mass. 2018).

### B.  The Partial Courtroom Closure

Based on well-founded concerns about security, the trial judge ordered the use of an attendee list to control access to the court room during the trial. Fernandes, 89 N.E.3d at 1135. The SJC found the following facts regarding the trial court's decision to partially close the courtroom:

> At a February 3, 2005, hearing on a protective order, the trial judge stated that she was "terribly concerned" about safety issues in this case.[2] Several of the codefendants and their family members had been shot at between the time of the original shooting and the defendant's indictment, and cooperating codefendants and witnesses had expressed concerns regarding distribution of the paper records of their grand jury testimony.[3] As a result, protective orders were put in place to restrict access to discovery materials, and the grand jury minutes were impounded.

---

[2] The involvement by the Cape Verdean Outlaws in ongoing violence that generated specific concerns about retaliation and witness intimidation, including threats to Jose Alves, was discussed at the hearing on the protective order.

[3] The defendant was set to be tried jointly with two codefendants, Henrique Lopes and Jose Lopes, until the first day of the defendant's trial, when the charges against the codefendants were

At a May 11, 2006, pretrial conference, the judge again raised concerns about security during trial, explaining that she would "take every precaution," partly because the court was short on court officers. She also first raised the possibility of creating a list of people permitted to enter the court room, and asked counsel to discuss this option.

On May 25, 2006, the judge reiterated her concerns that the gang elements of this case could exacerbate preexisting security problems at the court house. The judge again suggested an approved attendees list and requested that counsel prepare lists of family members and close friends that the parties might want in attendance. When counsel for then-codefendant Henrique Lopes objected, the judge enumerated the concerns behind her request for an approved attendees list. She stated that there were ongoing security issues at the court house, there was a lack of sufficient court officers, and the case presented "at least overtones of Cape Verdean gangs." The judge noted that prior cases with similar gang overtones had raised security issues, and her concern was to protect the security of everyone in the court room, including the defendant and court staff. She emphasized that media would be permitted to attend the trial and reiterated that the court house was not a secure facility. Counsel for the defendant and both codefendants all objected to the proposed attendees list, and the judge noted these objections for the record. She also asked counsel to propose other reasonable ways to address the underlying security concerns.

On May 30, 2006, the judge clarified that the parties could add people to the approved attendees list during trial with twenty-four hours' advance notice. The advance notice was necessary to conduct sufficient background checks on the individuals to ensure that they would not pose a safety risk in the court room. The judge further explained her concern about insufficient court officer staffing: six court officers would be present in the court room during trial, but this would leave no one to ensure security in the hallway outside.[4]

On June 8, 2006, the parties were again before the judge discussing trial security. After the defendant and codefendants submitted their initial lists of desired attendees, the Commonwealth objected to two individuals on the lists. The judge excluded one individual because he was a known associate of the defendant's gang, and the defendant did not object. The judge again stated that people could be added to the list with twenty-four hours' advance notice. She also stated that an individual allowed in the court room could be removed for the remainder of the trial if he or

---

nol prossed because of a missing witness. The Commonwealth's theory of the case was that the defendant and seven other individuals (including Henrique Lopes and Jose Lopes) perpetrated the crime in two separate automobiles. The Commonwealth had alleged that Henrique Lopes and Jose Lopes were two of the gunmen.

[4] The protocol was to have two court officers present for each defendant.

4

she exhibited "any untoward behavior." There were specific security concerns at this point as the codefendants, Henrique Lopes and Jose Lopes, were out on bail and might encounter witnesses or other trial attendees in the common areas of the court or during recesses. The judge wanted to avoid any potential inappropriate mingling.

On June 12, 2006, the parties discussed safety issues relating to a cooperating witness who was scheduled to plead guilty to a related crime during the trial. There were concerns about holding or transporting the defendant and codefendants near the cooperating witness. There were also safety concerns about remanding the codefendants to jail during the trial, as there were many potential gang members in jail who might "at least consider, rightly or wrongly," that the two men were "involved in this series of violent episodes." There also were ongoing issues with a key witness in the case against the codefendants, who were, at this point, being tried jointly with the defendant. The Commonwealth eventually nol prossed the charges against Henrique Lopes and Jose Lopes on June 20, 2006, because this key witness could not be located.[5]

Several issues rose during the trial. Before empaneling a jury on the first day of trial, the judge allowed the Commonwealth's motion to remove one of the persons on the defendant's trial attendees list because he had a record of a number of violent offenses.[6] The defendant did not object.[7]

On the second day of trial, there were concerns that the mother of one of the victims had suffered harm, as she had not been in communication with her family for over two days and was not present, though she had planned to attend the trial. The prosecutor also requested a warrant for Danny Fernandes, as he had not responded to subpoenas and his attorney could not locate him.

---

[5] On June 8, 2006, the prosecutor informed the judge that he had been unable to find or contact a key witness. On June 13, 2006, the Commonwealth filed a motion to continue because it could not locate this witness. This witness's family members were also out of contact with him and had reported their concerns for his well-being to the Boston police department.

[6] Two people were also voluntarily removed by the Commonwealth from their own list "as a matter of equity" because they also had a "fairly extensive record of violent crimes." The protective orders in this case showed that potential witnesses had significant concerns for their safety should their testimony fall into the wrong hands before trial.

[7] Because of a motion *in limine*, the judge also was aware of threats made by the defendant's brother to a judge in an unrelated criminal matter. On March 1, 2002, the defendant was on trial for an unrelated crime and his brother, Odairson Fernandes, was present at the court house with Jose Lopes, Henrique Lopes, and Joasihno Fernandes. When Odairson Fernandes left the court room, a Boston police officer overheard him say, "Fuck him that faggot ass judge. I'm seventeen years old, he can't fucking tell me what to do." Joasihno Fernandes replied, "Fuck that judge, I'll call him. What's the number, I call and threaten his fucking ass, fuck him."

5

On the third day of trial, individuals associated with the defendant ''stared down'' a witness and the victim's family as they left the court room, requiring the judge to speak with defense counsel to reiterate that there was to be no intimidation outside the court room.

The approved attendees list was finalized on the third day of trial. The defendant did not object to this list, which included five of his family members and five of his friends.

On the fourth day of trial, the parties were supposed to conduct a videotaped deposition of the surviving victim, Carvalho, but he expressed ''second thoughts'' about participating and was ultimately not deposed.

On the fifth day of trial, the judge questioned DaSilva, the driver of the vehicle in which the victims were riding, about his desire to invoke his constitutional right not to testify. He repeatedly told the judge that he was "scared" to testify, because "[t]he courtrooms are here, they ain't in the streets. The police ain't going to be there every day for me on the streets." He denied receiving any specific threats, but maintained that he was "scared [for] his life" because of "all the things going on."

Dosouto, one of the victims of the April 17 shooting, testified on the fifth day of trial. On the sixth day of trial, the prosecutor notified the judge that Dosouto's family had found a portion of an extensive memo prepared by counsel for former codefendant Henrique Lopes in their mailbox on the day before Dosouto's testimony. The protective orders in this case were designed to prevent trial preparation material from being disseminated. The judge recognized that this raised an issue of "fairly grave concern" and stated that she was "profoundly troubled" by the document's appearance, given the prior hearings on the need for protective orders.

On the eighth day of trial, the judge held a limited evidentiary hearing to discuss the disappearance of Danny Fernandes. The judge stated that she took "very seriously any suggestion that the disappearance of a witness in any manner can be connected to any collusion, intimidation, or the like." The judge ultimately granted the Commonwealth's motion for a continuance to give the Commonwealth time to find Danny Fernandes, stating that she was "[p]rofoundly troubled by the disappearance of these key witnesses."[8] The Commonwealth was unable to produce Danny Fernandes before the end of the trial.

---

[8] That same day, at the Commonwealth's request, the judge allowed an individual who had been attending the trial, to be asked to leave the court room because of a history of incidents with Boston police detective who was scheduled to testify that morning. Rather than exclude the individual for only the detective's testimony and have to explain why to him, the judge excluded him from the morning session.

6

Fernandes, 89 N.E.3d at 1135–38.

### C.     Procedural Background

Following his conviction in June 2006, Fernandes filed a motion for a new trial in Suffolk Superior Court on September 30, 2014 alleging a violation of his Sixth Amendment right to a public trial, which was denied on November 23, 2015.  [ECF No. 1 at 3].  He appealed, partly on this same basis, to the SJC, which affirmed the conviction on February 2, 2018.  See generally Fernandes, 89 N.E.3d 1130; see also [ECF No. 1 at 2].  Fernandes did not file a petition for certiorari in the United States Supreme Court.  [ECF No. 1 at 3].

Fernandes filed the instant petition for a writ of habeas corpus on May 1, 2019, [ECF No. 1], and a supporting memorandum of law on July 6, 2021, [ECF No. 19].  Respondent opposed on October 22, 2021, [ECF No. 24], and Fernandes replied on January 14, 2022, [ECF No. 31].

## II.    LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> To be deemed contrary to clearly established federal law, a state court decision must announce[] a rule of law that directly contradicts existing Supreme Court precedent or . . . reach[] a different result than the Supreme Court on materially indistinguishable facts.  An unreasonable application occurs when the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case.  Federal habeas relief only provides a remedy

7

> for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.
>
> These standards ensure that federal habeas relief will be granted only in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents. One consequence of this rule is that a federal court sitting in habeas jurisdiction may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous.

Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018) (alterations in original) (internal citations and quotation marks omitted).

With regard to whether a factual determination was unreasonable, the Supreme Court has noted that "[t]he term 'unreasonable' is no doubt difficult to define." Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). "It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Id. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (second alteration in original) (quoting Rice v. Collins, 546 U.S. 333, 341–42 (2006)). "If [§ 2254(d)'s] standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011).

### III.     DISCUSSION

As grounds for relief, Fernandes asserts that (1) the trial judge's decision to open his trial to only the press and individuals on an approved attendees list violated his right to a public trial under the Sixth and Fourteenth Amendments, as well as under the Massachusetts Declaration of Rights, see [ECF No. 1 at 3, 5]; see also [ECF No. 19], and (2) the SJC improperly affirmed his conviction based on an unreasonable application of federal law (namely the four-part Waller test)

8

and an unreasonable determination of the facts, [ECF No. 19 at 4–5; ECF No. 31]. Respondent maintains that the SJC's decision was not contrary to or an unreasonable application of clearly established Supreme Court law, or based on an unreasonable determination of the facts before it. See generally [ECF No. 24].[9]

Although the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial," the Supreme Court has determined that, in certain circumstances, the right to an open trial may give way to other interests. Waller v. Georgia, 467 U.S. 39, 45 (1984). For a court to exclude the public from any stage of a criminal trial, there must be "[1] an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." Presley v. Georgia, 558 U.S. 209, 214 (2010) (quoting Waller, 467 U.S. at 45). The Court reviews the SJC's consideration of each of the four Waller factors in turn.[10]

---

[9] Respondent also adds that the modified Waller test for "partial" closures has not been endorsed by the Supreme Court and, as such, cannot serve as the basis for habeas relief because it is not clearly established Supreme Court law, citing Angiano v. Scribner, 366 F. App'x 726, 727 (9th Cir. 2010). See [ECF No. 24 at 12–13]. As Fernandes rightly points out, Angiano identified a circuit split on whether the partial closure test applies when only one person is excluded from trial. See [ECF No. 31 at 6–7 n.2; Angiano, 366 F. App'x at 727]. Given that (1) the First Circuit has repeatedly reviewed these types of petitions on their merits, see Bucci v. United States, 662 F. 3d 18, 27 (1st Cir. 2011); United States v. Laureano-Perez, 797 F. 3d 45, 77 (1st Cir. 2015), (2) Fernandes disputes that this was a "partial" closure, [ECF No. 31 at 6 n.2], and (3) that this Court would find the security interests in this case compelling even under the full Waller test, there is no need to proceed with this analysis.

[10] Fernandes's contention that the SJC's consideration of the Waller factors amounted to an improper "*post-hoc*" analysis is unavailing. [ECF No. 19 at 5]. See Fernandes, 478 Mass. at 733 ("In a partial closure context . . . a reviewing court may examine the record itself to see if it contains sufficient support for the closure, even in the absence of formal or express findings by the judge.") (quoting Commonwealth v. Cohen (No. 1), 921 N.E.2d 906, 924 (Mass. 2010)); see also United States v. Farmer, 32 F.3d 369, 370–71 (8th Cir. 1994) ("specific findings . . . are not necessary if we can glean sufficient support for a partial temporary closure from the record");

A. **Security Interest**

Because the trial court in this case did allow some members of the public and the press in the courtroom, Fernandes's trial involved only a partial closure. See [ECF No. 24 at 12]; see also United States v. DeLuca, 137 F.3d 24, 32–35 (1st Cir. 1998) (finding a "partial" closure where marshals were screening and recording the identification of all trial spectators at the entrance to the courtroom).

In the case of a partial closure—"where courtroom access is restricted but some members of the public are permitted to attend"—the First Circuit has held that a "'substantial' interest, rather than a 'compelling' one, will justify [a] partial closure." Laureano-Perez, 797 F. 3d at 77 (alteration in original) (quoting Bucci, 662 F. 3d at 23).

It is well-established that security and safety concerns are interests that may warrant a courtroom closure in certain circumstances. See Caldwell v. Vidal, No. 12-cv-11868, 2016 WL 1696596, at *9 (D. Mass. 2016) ("'[C]oncrete' safety concerns are one circumstance that might warrant the closure of a courtroom."); Gannett Co. v. DePasquale, 443 U.S. 368, 388–89 n.19 (1979) ("[T]rial judges have been given broad discretion to exclude spectators to protect order in their courtrooms."); Presley, 558 U.S. at 215 ("There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant [a courtroom closing].")

---

Bowden v. Keane, 237 F.3d 125, 131–32 (2d Cir. 2001) (while specific findings required before complete closure, "competent evidence from the record" can support partial closure).

Fernandes asserts that the "safety concerns were . . . no more nor less than the generic type of concern that could justify a courtroom closure in any case," insufficient to warrant abrogation of the right and that the trial court failed to make any formal "findings" in this regard, but only expressed "generalized concerns[.]"  [ECF No. 19 at 21–22].  Both arguments mischaracterize the record.  The SJC's determination that the security risks in Fernandes's trial were substantially greater than normal circumstances was amply supported by the facts.

As the SJC noted, "[the] case was permeated with concerns about security from the outset, as evidenced through six pretrial hearings and conferences and discussions at trial[]" and the trial judge was "terribly concerned" about witness intimidation and trial safety issues. Fernandes, 89 N.E. 3d at 1135.  The SJC further found:

> In four separate incidents in June, 2003, before the defendant's indictment, several of the codefendants and their family members had had shots fired at them. Codefendants and cooperating witnesses had expressed grave concerns regarding retaliation. The disappearances of important witnesses before the trial heightened the concerns.
>
> Security issues also arose during the trial, further supporting the concerns about witness intimidation and trial safety. Different key witnesses were missing on the first and last day of trial. Arguable instances of gang intimidation occurred: individuals associated with the defendant "stared down" a witness and the victim's family as they left the court room, requiring the judge to speak with defense counsel to reiterate that there was to be no intimidation outside the court room. A witness who had been shot at in the April 28 incident told the judge that he was afraid to testify.
>
> In addition to the case-specific security concerns, the judge noted that prior cases with similar gang overtones had presented security issues.
>
> * * *
>
> Finally, the judge had to take into account the number of available court officers, and whether that number was sufficient in these trying circumstances. The record leading up to the trial showed the judge's significant security concerns that the feuding gang issues in this particular case could exacerbate the existing security challenges at the court house.
>
> [Id. at 1139]

Moreover, there were concerns about the possibility of sensitive case documents being made public.  [Id. at 1137].

The SJC's conclusion that the heightened security and witness intimidation concerns in this case satisfied the first Waller factor is unassailable.  These security concerns, which the SJC aptly described as "extreme[,]" Fernandes, 89 N.E. 3d at 1138, are far from the "generic risk" of "prospective jurors overhearing loose talk in the gallery" as Fernandes suggests, [ECF No. 19 at 21].  The Court officer shortages, coupled with the disappearances of key witnesses, and the ongoing gang activity, including intimidation and retaliation, go far beyond the circumstances of most criminal trials.

**B.   Broadness**

Fernandes next alleges that the partial closure of the courtroom was overbroad, not tailored to its goal, and amounted to a complete closure with respect to the general public.  [ECF No. 19 at 22–23]; see also [ECF No. 31].

In finding that the approved attendee list in this case was narrowly tailored to accomplish its purpose, the SJC concluded that: "[t]he defendant was able to put friends and family members on the list . . . . The defendant and the Commonwealth also could add to the list other individuals they wanted with twenty-four hours' advance notice." Fernandes, 89 N.E. 3d at 1141.  Further, the SJC found that "the press was expressly included on the list, and not in any way excluded[]" and that "[t]he list and the exclusions were directly responsive to the significant identified risks of gang-related violence and intimidation."  [Id. at 1140–41].  Moreover, Fernandes made no specific objections to the names included on or excluded from the list.  Id. at 1140; [ECF No. 24 at 20].

As emphasized by the SJC, the trial court was trying to find a way to balance the legitimate safety concerns presented by the case against the defendant's right to a public trial.  Fernandes contends that the security risks in this case, and the trial judge's consideration of those risks, have been largely overstated.  But, this assertion, that any "potential security concerns . . . had not, and never did, manifest themselves during the course of the trial[,]" [ECF No. 31 at 2], is unavailing given the record.[11]  Nevertheless, "[a] judge need not wait for a witness to be intimidated, the court room to be disrupted, or a specific threat before taking appropriate steps to address the risk of such misconduct." Commonwealth v. Maldonado, 466 Mass. 742, 753 (2014).  Fernandes argues that a sign-in system or screening procedure, which were employed in Maldonado and Commonwealth v. Ray, 467 Mass. 115 (2014), would have been adequate.  But, as the First Circuit has recognized, because "[t]hese difficult judgments are matters of courtroom governance which require a 'sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings[,]'" courts "should be hesitant to displace a trial court's judgment call in such circumstances." DeLuca, 137 F.3d at 34.  Here, by using an attendee list to control access to the courtroom, the trial judge ensured the safety of all trial participants, while also allowing meaningful access to the proceedings including by allowing the press in without limitation; permitting all parties to submit for approval names of anyone they wanted to attend the proceedings, both before trial and throughout trial; and by ultimately excluding only two individuals from Fernandes's list: "one gang member known to be an

---

[11] The findings of fact by state trial and appellate courts can be rebutted only with "clear and convincing evidence to the contrary."  RaShad, 300 F.3d at 35; see 28 U.S.C. § 2254(e)(1).

associate of the defendant" and another individual with a record of violent offenses. Fernandes, 89 N.E. 3d at 1140.  Although the list may have been an additional hurdle to public access, contrary to Fernandes's assertion, it did not rise to the level of an absolute bar.  Cf. Tucker v. Superintendent Graterford SCI, 667 F. App'x 768, 778 (3rd Cir. 2017) (complete closure was not overbroad "given the gang related origins of the case, the number of people involved in the underlying incidents and resulting witness intimidation, the frequent and unexpected disruptions, and the repeated disregard of the trial court's many admonishments").[12]

### C. Reasonable Alternatives

"Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."  Presley, 558 U.S. at 215.  In the instance of a courtroom closure, courts are required to consider, either implicitly or explicitly, reasonable alternatives.  See Laureano-Perez, 797 F.3d at 78.  Still, that there "might possibly" have been reasonable

---

[12] Fernandes counters that, in Tucker, the circuit court "took pains to express its "deep[] concern[] . . . that Pennsylvania courts, including the Superior Court in Tucker's case, are not applying Waller when analyzing defendants' Sixth Amendment public-trial claims," [ECF No. 31 at 7], but that concern is unfounded here.  In that decision, unlike here, the Third Circuit was concerned that the state appellate court had analyzed the claims under an entirely different standard pulled from a different line of case law instead of applying the Waller test.

Additionally, nothing in Davis v. United States, 247 F. 394 (8th Cir. 1917), an over-hundred-year-old Eighth Circuit case that Fernandes emphasizes, compels a different conclusion.  See [ECF No. 19 at 15–16].  That court found that a trial court's partial closure of a court room (the court applies this language liberally and retroactively, as this case predates Waller) violated the Sixth Amendment, where the trial court could have instead mitigated its relatively innocuous problems by excluding one intoxicated man from the court room, reducing noise in the hallway, keeping the aisles of the crowded court room clear, and denying further entry once all the seats were filled.

alternatives "does not render [Fernandes's] claim meritorious." Cabral-Varela v. Rodrigues, No. 20-cv-11073, 2020 WL 7056009 at *7 (D. Mass. Dec. 2, 2020).

The findings of fact indicate that the trial judge considered alternatives to using an approved attendees list. As a preliminary matter, the judge gave both parties ample opportunity to propose any reasonable alternatives to address the underlying security issue, but no counsel put forth any alternatives. Fernandes, 89 N.E. 3d at 1141–42. Nonetheless, the SJC acknowledged the Supreme Court's declaration in Presley that trial courts must consider alternatives even where none are offered by the parties, see 558 U.S. at 214, and accordingly noted that the judge had explicitly considered other options including procuring further security personnel and "also sought meaningful alternative solutions by discussing her concerns with her chief justice and the chief court officer, neither of whom could suggest a better alternative[,]" Fernandes, 89 N.E.3d at 1141. Finally, after deciding to implement the attendees list, the judge recognized the parties' potential interest in pretrial appellate review and specifically allowed time for the parties to seek interlocutory review, which no party did. Id. at 1142.

This Court, like the SJC before it, finds that the trial judge considered reasonable alternatives before adopting the use of an approved attendee list. That Fernandes is unsatisfied with the chosen procedure, which this Court concludes was reasonable, does not save his claim. See Cabral-Varela, 2020 WL 7056009, at *7 ("That another judge might possibly have responded differently . . . does not render [petitioner's] claim meritorious."); Maldonado, 466 Mass. at 753 (reviewing courts must "give deference to a trial judge's appraisal both of the air of tension and the dangers it posed").

### D. Adequate Findings

This final Waller factor is also satisfied. As already noted, because it was a partial closure, the SJC only needed to review the record to determine whether it contained "sufficient support for the closure, even in the absence of formal or express findings by the judge." Cohen (No. 1), 921 N.E.2d at 924. Here, the Court agrees with the SJC's determination that there were adequate findings in the record to support the partial closure where the "case involved numerous requests for protective orders responding to codefendant and witness concerns that testifying might result in harm" and "[t]he trial judge extensively discussed her security concerns and her reasoning for imposing the approved attendees list with the parties on multiple occasions prior to the trial." Fernandes, 89 N.E.3d at 1142.

Accordingly, the Court concludes that the SJC's adjudication of the closure in this case was not contrary to, or involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. In so holding, this Court does not minimize the critical importance of allowing public access to criminal trials, but also recognizes that federal law allows court room closures in limited circumstances and gives considerable deference to trial judges' assessments of their court rooms. This case clearly warranted such a partial closure to ensure the safety of the public and all participants to the trial.

## IV. CONCLUSION

For these reasons, Fernandes's petition for a writ of habeas corpus, [ECF No. 1], is DENIED.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner. Rules Governing Section 2254 Cases, R. 11(a). The Court grants a certificate of appealability to Fernandes.

**SO ORDERED.**

September 15, 2022                                                      /s/ Allison D. Burroughs
                                                                        ALLISON D. BURROUGHS
                                                                        U.S. DISTRICT JUDGE